## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| Jennifer Lynn E.,<br><br>                    Plaintiff,<br><br>v.<br><br>Kilolo Kijakazi, Acting Commissioner of<br>Social Security,[1]<br><br>                    Defendant. | Civil No. 3:20-cv-00695-TOF<br><br><br><br>September 30, 2021 |

## <u>RULING ON PENDING MOTIONS</u>

The Plaintiff, Jennifer Lynn E.,[2] applied for Disability Insurance Benefits ("DIB") and Supplemental Security Income benefits ("SSI") under Titles II and XVI, respectively, of the Social Security Act.  (R. 465-73, 475-76.)  The Social Security Administration ("SSA") rejected both claims, and the Plaintiff sought reconsideration and then a hearing before an Administrative Law Judge ("ALJ").  In an unusual step, the SSA issued reconsideration and hearing decisions on only the DIB claim.  (R. 348, 209.)

The Plaintiff then filed this action, seeking judicial review of the SSA's decision.  She has moved the Court for an order reversing the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") on her DIB claim (ECF No. 16), and "remand[ing] the case to

---

[1]     When the Plaintiff filed this action, she named the then-Commissioner of the Social Security Administration, Andrew Saul, as the defendant.  (Compl., ECF No. 1.)  Commissioner Saul no longer serves in that office.  His successor, Acting Commissioner Kilolo Kijakazi, is automatically substituted as the defendant pursuant to Fed. R. Civ. P. 25(d).  The Clerk of the Court is respectfully requested to amend the caption of the case accordingly.

[2]     Pursuant to Chief Judge Underhill's January 8, 2021 Standing Order, the Court will not use the Plaintiff's last name in this opinion.  *See* Standing Order Re: Social Security Cases, No. CTAO-21-01 (D. Conn. Jan. 8, 2021).

the Commissioner with instructions to award benefits." (ECF No. 16-2, at 19.)  "Alternatively," she "seeks a remand with instructions to send the claim back to the Disability Determination Services for a decision on" her SSI claim, or to remand her case for a rehearing based "upon the substantial evidence and proper legal standards" – which, she argues, the ALJ failed to apply. (*Id.*) The Commissioner has moved for an order affirming the final decision on the DIB claim. (ECF No. 19.)

Having carefully considered the parties' submissions, and having carefully reviewed the entire, 1,774-page administrative record, the Court concludes that the ALJ committed no reversible legal error in his handling of the Plaintiff's DIB claim and that his decisions were supported by substantial evidence. Accordingly, the Plaintiff's motion (ECF No. 16) is **DENIED** and the Commissioner's motion for an order affirming the final decision on the DIB claim (ECF No. 19) is **GRANTED.** The Court agrees with the Commissioner that it lacks jurisdiction over the SSI claim, and it therefore declines to issue any orders with respect to it.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

On November 22, 2016, the Plaintiff filed applications for DIB under Title II and SSI benefits under Title XVI. (R. 465-74, 475-76.) She claimed that she could not work because of "ulcerative colitis, high blood pressure, migraines, asthma, PTSD, nephrolithiasis-kidney stones, hypothyroidism, porosities in both hips, and mitral valve regurgitation." (R. 314-15, 330-31.) She alleged a disability onset date of February 29, 2012. (R. 315, 331.)

On November 29, 2016, the SSA denied the Plaintiff's SSI claim for income-related reasons. (R. 366-75.) On September 12, 2017, it issued disability determinations of "not disabled" with respect to both the DIB claim (R. 314-20) and the SSI claim. (R. 330-45.) Through counsel, the Plaintiff requested reconsideration of both decisions. (R. 391.) On April 4, 2018, the SSA

denied the DIB claim at the reconsideration level (R. 348-64), but it issued no corresponding decision on the SSI claim.

The Plaintiff then requested a hearing before an ALJ.  (R. 401.)  Perhaps because her hearing request only referenced her "claim for disability-worker" benefits (*id.*), the ALJ's hearing notice listed only her "application . . . for . . . Disability Insurance Benefits" under the heading of "Issues I Will Consider."  (R. 423.)  In any event, ALJ Ronald Thomas held a hearing on December 11, 2018.  (R. 272-313.)  The Plaintiff's counsel, Kerin Woods, appeared on her behalf.  (R. 272.)  The ALJ also heard testimony from a vocational expert ("VE"), Christine E. Spaulding.  (R. 303-10, 557-58.)

On February 25, 2019, the ALJ issued an unfavorable decision.  (R. 209-32.)  As will be discussed below, ALJs are required to follow a five-step sequential evaluation process in adjudicating Social Security claims (*see* discussion, Section II *infra*), and ALJ Thomas's written decision followed that format.  At Step One of his analysis, he found that the Plaintiff had not engaged in substantial gainful activity since her claimed disability onset date of February 29, 2012 through her date last insured of September 30, 2017.  (R. 212.)  At Step Two, he found that the Plaintiff suffers from the severe impairments of asthma, degenerative disc disease, colitis, hernias, kidney stones, affective disorder, post-traumatic stress disorder ("PTSD"), and vertigo.  (*Id.*)  At Step Three, he concluded that the Plaintiff's impairments or combination of impairments did not meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart B, Appendix 1.  (*Id.*)  He then determined that, notwithstanding her impairments, the Plaintiff retained the residual functional capacity to:

> [P]erform light work as defined in 20 CFR 404.1567(b) except:  The claimant was limited to occasional bending, balancing, twisting, squatting, kneeling, crawling, and climbing but no climbing of ropes, scaffolds, and ladders.  The claimant should avoid hazards such as dangerous machinery, heights, and vibration but she was

okay to drive.  The claimant required an environment free from concentrated poor ventilation, dusts, fumes, gases, odors, humidity, wetness, and temperature extremes.  The claimant could perform occasional bilateral reaching overhead.  The claimant was limited to occasional interaction with the public, coworkers, and supervisors.

(R. 215.)  At Step Four, the ALJ found that the Plaintiff was unable to perform any past relevant work.  (R. 221.)  Finally, at Step Five, the ALJ relied on the VE's testimony to find that there are jobs that exist in the national economy that the Plaintiff could perform, including "Price Marker," "Mail Sorter," and "Collator Operator."  (R. 222.)  In summary, he found that the Plaintiff had "not been under a disability, as defined in the Social Security Act, at any time from February 29, 2012 through September 30, 2017."  (R. 222-23.)

On April 4, 2019, the Plaintiff requested that the Appeals Council review the ALJ's decision.  (R. 461-64.)  During the appeals process, she submitted additional treatment records dating from February through August 2019.  (R. 2.)  The Appeals Council noted the additional material, but stated that it did not "relate to the period at issue" because the ALJ had "decided [her] case through September 30, 2017."  (*Id.*)  The Council added that records from 2019 did "not affect the decision about whether you were disabled beginning on or before September 30, 2017."  (*Id.*)  On the question of whether she was disabled before that date, however, the Commissioner's decision was "final."  (R. 1.)

The Plaintiff then filed this action on May 19, 2020.  (Compl., ECF No. 1.)  The Commissioner answered the complaint by filing the administrative record on September 15, 2020.  (ECF No. 14; *see also* D. Conn. Standing Scheduling Order for Social Security Cases, ECF No. 4, at 2 (stating that the Commissioner's filing of the administrative record is "deemed an Answer (general denial) to Plaintiff's Complaint").)  On November 16, 2021, the Plaintiff filed a motion for an order reversing or remanding the Commissioner's decision.  (ECF No. 16.)  On January 29, 2021, the Commissioner filed a motion for an order affirming that decision.  (ECF No. 19.)  The

Plaintiff did not file a reply brief, and her time for doing so has expired.  (*See* ECF No. 4, at 4.) The parties' motions are therefore ripe for decision.

## II.   APPLICABLE LEGAL PRINCIPLES

To be considered disabled under the Social Security Act, "a claimant must establish an 'inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.'" *Smith v. Berryhill*, 740 F. App'x 721, 722 (2d Cir. 2018) (summary order) (quoting 20 C.F.R. § 404.1505(a)).   To determine whether a claimant is disabled, the ALJ follows a familiar five-step evaluation process.

At Step One, the ALJ determines "whether the claimant is currently engaged in substantial gainful activity." *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008)).  At Step Two, the ALJ analyzes "whether the claimant has a severe impairment or combination of impairments." *Id.*  At Step Three, the ALJ then evaluates whether the claimant's disability "meets or equals the severity" of one of the "Listings" – that is, the specified impairments listed in Appendix 1 to Subpart P of 20 C.F.R. Part 404. *Id.*  At Step Four, the ALJ uses a residual functional capacity ("RFC") assessment to determine whether the claimant can perform any of her "past relevant work." *Id.*  At Step Five, the ALJ considers "whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's [RFC], age, education, and work experience." *Id.*  The claimant bears the burden of proving her case at Steps One through Four. *Id.*  At Step Five, "the burden shift[s] to the Commissioner to show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 445 (2d Cir. 2012) (per curiam).

In reviewing a final decision of the Commissioner, this Court "perform[s] an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). Its role is to determine whether the Commissioner's decision is supported by substantial evidence and free from legal error. "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (internal quotation marks omitted).

A disability determination is supported by substantial evidence if a "reasonable mind" could look at the record and make the same determination as the Commissioner. *See Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). Although the standard is deferential, "[s]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (internal quotation marks and citations omitted). When the decision is supported by substantial evidence, the Court defers to the Commissioner's judgment. In other words, "[w]here the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [this Court] will not substitute [its] judgment for that of the Commissioner." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).

An ALJ does not receive the same deference if he has made a material legal error. Put differently, district courts do not defer to the Commissioner's decision "[w]here an error of law has been made that might have affected the disposition of the case." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks omitted). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's

decision." *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

In this case, the Plaintiff claims that the ALJ's decision was legally erroneous or unsupported by substantial evidence in six principal respects. (*See generally* ECF No. 16-2.) The Court will examine each argument in turn.

## III. DISCUSSION

### A. The ALJ's Treatment of the SSI Claim

The Plaintiff first argues that the ALJ erred in "fail[ing] to address the administrative issue of the absence of a Reconsideration decision" on the SSI claim. (ECF No. 16-2, at 5.) She says that she "believed that the hearing was as to both the Title II and Title XVI claim," despite the fact that "the Title XVI claim had not been adjudicated at the reconsideration level," because the SSA's standard practice is to "decid[e] concurrent claims at the same time at the reconsideration level." (*Id.*) She acknowledges that her belief was "erroneous," because "the Title XVI claim had not been adjudicated" at that level. (*Id.*) She nonetheless argues that the ALJ had an affirmative obligation to "raise this issue" and postpone or dismiss the hearing, and that he committed reversible error when he instead chose to forge ahead. (*Id.* at 5-6) (citing HALLEX §§ 1-2-4-5, 1-2-4-30.) The Court disagrees.

To be sure, the Plaintiff was entitled to fair notice of her hearing and of the issues to be decided. The SSA's regulations require notice to be sent "at least 75 days before the date of the hearing," and further require that the notice "tell [the claimant] . . . [t]he specific issues to be decided in [her] case." 20 C.F.R. § 404.938(b)(1). The Supreme Court has explained that, "before every [Social Security] hearing, the SSA mails claimants a 'notice of hearing' that includes

logistical information and lists . . . 'the specific issues to be decided in the case.'" *Carr v. Saul*, __ U.S. __, 141 S. Ct. 1352, 1360 (2021) (quoting 20 C.F.R. § 404.938(b)(1)).

In this case, however, the Plaintiff received fair notice that the ALJ planned to hear only the DIB claim.  In his September 19, 2018 hearing notice, ALJ Thomas listed the Plaintiff's "application of November 10, 2016 for a Period of Disability and Disability Insurance Benefits under sections 216(i) and 223(a) of the Social Security Act" under the heading of "Issues I Will Consider."  (R. 423.)  He added that he would "consider whether [she had] enough earnings under Social Security to be insured for a Period of Disability and Disability Insurance Benefits" and, if she did, would "decide whether [she] became disabled while [she was] insured."  (R. 424.)  He wrote that SSA records "indicate[d] that [her] date last insured is September 30, 2017," and that accordingly, he would "decide whether [she] became disabled on or before that date."  (*Id.*)  In other words, the notice made clear that only the DIB claim would be the subject of the hearing.

The Plaintiff cites no persuasive authority for the proposition that the ALJ was obliged to do any more.  She references HALLEX Sections 1-2-4-5 and 1-2-4-30 (ECF No. 16-2, at 6), but these stand only for the proposition that an ALJ *may* dismiss a request for a hearing when "[t]he person requesting a hearing has no right to a hearing."  They do not support her argument that an ALJ *must* dismiss the hearing, when only one of her two claims is unripe.

The Commissioner responded to the Plaintiff's argument by pointing out that the Court lacks jurisdiction over her SSI claim.  (ECF No. 19-1, at 3-5.)  This is of course correct, because 42 U.S.C. § 405(g) authorizes judicial review of "final decision[s] of the Commissioner of Social Security made after a hearing," and there has been no hearing or final decision on the SSI claim in this case.  But it is essentially a straw man argument, because the Plaintiff does not dispute this point; indeed, she concedes that her "administrative remedies had not yet been exhausted as to the

Title XVI claim." (ECF No. 16-2, at 5.) Her principal argument is that the ALJ owed her more notice that the hearing would address only the DIB claim, but the Court disagrees for the reasons stated above.

###### B.  The Plaintiff's Challenges to the ALJ's Development of the Record

The Plaintiff's second argument is related to her first. She asserts that, because the ALJ had not clarified the issues to be considered, the hearing "focused almost exclusively on the plaintiff's current health and not her health as of the date last insured in September 2017." (ECF No. 16-2, at 6.) She says that this led to two distinct failures to develop a complete administrative record – first, a failure to elicit "testimony from the plaintiff as to her medical condition prior to the date last insured," and second, a failure to solicit a retrospective opinion from her treating osteopathic physician, Dr. Colleen Casey, "as to the plaintiff's medical condition prior to" that date. (*Id.* at 6-7.) The Plaintiff asserts that these two omissions constituted a reversible error in the development of the record "as to the issue of disability prior to the date last insured." (*Id.* at 6.) The Court disagrees with this argument as well.

With respect to the scope of the hearing testimony, the Plaintiff is correct that an ALJ has a duty to develop an adequate record, through testimony or otherwise. "Before determining whether the Commissioner's conclusions are supported by substantial evidence," a district court "'must first be satisfied that the claimant has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the [Social Security] Act.'" *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)) (alteration in original). "Even when a claimant is represented by counsel, it is the well-established rule in our circuit 'that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits

proceeding.'" *Id.* (quoting *Lamay*, 562 F.3d at 508-09).  Courts have held that this duty includes the duty to "ask[] meaningful, probing questions about [the claimant's] medical history and . . . symptoms" at the hearing, at least when the claimant is *pro se*.  *E.g., Bueno v. Comm'r of Soc. Sec.*, No. 17-cv-1847 (VSB) (RWL), 2018 WL 5798583, at *10 (S.D.N.Y. Aug. 20, 2018).  And they have held that an ALJ breaches this duty when, for example, he "cut[s] short testimony" from a *pro se* claimant "relevant to" key questions, *Thibodeau v. Comm'r of Soc. Sec.*, 339 F. App'x 62, 64 (2d Cir. 2009) (summary order), or where he leaves a "scant record" that "reveals a host of lost opportunities to explore the facts."  *Cruz*, 912 F.2d at 11-12.

    In this case, however, the hearing transcript reflects a sufficient level of questioning about the Plaintiff's health at and before her date last insured.  The ALJ asked the Plaintiff why she had stopped working in 2016.  (R. 276.)  He asked her several questions about why she felt medically and functionally unable to do the job that she had been doing until then (R. 277), and he gave her attorney an opportunity to examine her.  (R. 289-300.)  Moreover, he asked his questions against a backdrop of an administrative record that included hundreds of pages of progress notes and test results detailing her medical condition and functional abilities throughout 2016 and 2017.  Having carefully examined the full transcript, the Court is unable to conclude that this level of questioning, asked of a represented claimant, breached the ALJ's duty to develop the record.  *Cf. Flanigan v. Colvin*, 21 F. Supp. 3d 285, 298-307 (S.D.N.Y. 2014) (observing that the claimant bears the burden at Steps One through Four of the five-step evaluation process, notwithstanding the ALJ's duty to develop the record); *Kavanaugh v. Saul*, No. 3:18-cv-01521 (MPS), 2020 WL 1181436, at *2 (D. Conn. Mar. 12, 2020) ("[The claimant] bears the burden of establishing that he had a disability within the meaning of the [Social Security] Act on or before" his date last insured.).

The Court is similarly unable to conclude that it was legal error for the ALJ not to seek a retrospective opinion from Dr. Casey.   When the administrative record "contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity," *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013) (summary order), the failure to obtain medical source opinion evidence is not "*per se* error."   *Sanchez v. Colvin*, No. 13-CIV-6303 (PAE), 2015 WL 736102, at *5 (S.D.N.Y. Feb. 20, 2015); *see also Sinclair v. Saul*, No. 3:18-cv-00656 (RMS), 2019 WL 3284793, at *7 (D. Conn. Jul. 22, 2019) (same).   Stated differently, when the ALJ possesses an "extensive medical record," the lack of medical opinion evidence does not automatically create an obvious gap in the record that "necessitate[s] remand."   *Swiantek v. Comm'r of Soc. Sec.*, 588 F. App'x 82, 84 (2d Cir. 2015) (summary order).   "[A] medical source statement is not necessarily required to fully develop the record where 'the record contains sufficient evidence from which an ALJ can assess the [claimant's RFC].'"   *Crespo v. Comm'r of Soc. Sec.*, No. 18-cv-435, 2019 WL 4686763, at *3 (D. Conn. Sept. 25, 2019) (quoting *Tankisi*, 521 F. App'x. at 34).

In this case, the record provided the ALJ with a sufficient basis for assessing the Plaintiff's residual functional capacity as of her date last insured.   With respect to the Plaintiff's mental impairments, the record included treatment notes from 2014 to 2017, including a note of a September 25, 2017 visit that recorded "mood," "affect," "thought process," "orientation" and "behavior/functioning" all "within normal limits."   (R. 1116; *see also* R. 217.)   With respect to her physical limitations, the record contained hundreds of pages of treatment notes, physical therapy notes, and records of diagnostic testing predating her date last insured.   (*See generally* R. 571-1152, 1385-1659.)   These records included (i) a report of an intact physical examination documenting full range of motion in the extremities on January 13, 2017 (R. 219, 838); (ii) another

report of an intact physical examination documenting "normal range of motion" and "no motor deficits" on August 15, 2017 (R. 220, 915); and (iii) a report of a September 1, 2017 examination that noted the Plaintiff's complaints of neck pain radiating into the extremities, but which the ALJ accounted for in including "environmental, postural, exertional, and manipulative restrictions" in the RFC. (R. 220, 934-37.) The record also included a number of notes documenting the activities of daily living in which the Plaintiff engaged. (R. 220 (citing treatment notes documenting Plaintiff's ability to exercise, cook, do laundry, etc.).)

Moreover, before she can successfully claim that it was reversible error not to solicit a retrospective opinion from Dr. Casey, the Plaintiff must show that she was harmed by that error. "When an unsuccessful claimant files a civil action on the ground of inadequate development of the record, the issue is whether the missing evidence is significant." *Santiago v. Astrue*, No. 3:10-cv-00937 (CFD), 2011 WL 4460206, at *2 (D. Conn. Sept. 27, 2011) (citing *Pratts v. Chater*, 94 F.3d 34, 37-38 (2d Cir. 1996)). "The plaintiff in a civil action must show that he was harmed by the alleged inadequacy of the record." *Id.* (citing *Shinseki v. Sanders*, 556 U.S. 396 (2009)); *see also Mahmud v. Saul*, No. 3:19-cv-01666 (TOF), 2020 WL 6866674, at *12 (D. Conn. Nov. 23, 2020). To demonstrate such harm, a plaintiff "must show that the additional medical reports would undermine the ALJ's decision," *Lena v. Astrue*, No. 3:10-cv-00893 (SRU), 2012 WL 171305, at *9 (D. Conn. Jan. 20, 2012) (internal quotation marks omitted), because "[m]ere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand." *Nelson v. Apfel*, 131 F.3d 1228, 1235 (2d Cir. 1997); *see also Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996) (holding that ALJ did not commit reversible error when he failed to request retrospective opinion evidence, because "there was nothing presented at the hearing to indicate that retrospective assessments would have revealed any useful information").

In this case, the Plaintiff has not come forward with sufficient reasons to suppose that a retrospective opinion "would undermine the ALJ's decision." *Lena*, 2012 WL 171305, at *9. As the Commissioner points out (ECF No. 19-1, at 7), the record does contain a March 29, 2018 questionnaire response from Dr. Casey, in which the doctor opined that the Plaintiff's then-existing conditions would prevent her from working only for "[six] months or more, but less than [twelve] months." (R. 1190.) An October 31, 2018 letter from Dr. Casey likewise says only that the Plaintiff was unable to work "at this time," and indeed the doctor said that she could not opine on when the Plaintiff would be able to return to work.[3] (R. 1774.) The Plaintiff bears the burden to prove a disability "which has lasted or can be expected to last for a continuous period of not less than [twelve] months," *Smith*, 740 F. App'x at 722 (quoting 20 C.F.R. § 404.1505(a)) (internal quotation marks omitted), and here, the record does not provide a sufficient basis for supposing that a retrospective opinion from Dr. Casey would document a disability of that anticipated duration as of the date last insured. The ALJ did not err in failing to request such an opinion.

### C.     The Plaintiff's Challenges to the ALJ's Assessment of Her Medical Records

The Plaintiff next argues that the ALJ erred in his assessment of the medical records of her cervical disc disease. (ECF No. 16-2 at 7-9). In this section of her brief, she expresses the argument in medical rather than functional or vocational terms. She faults the ALJ for failing to discuss all of the findings in a May 1, 2017 MRI report, which in turn led him to "[in]correctly assess the severity of the cervical degenerative disc disease" and to miss that she had "cervical radiculopathy causing numbness in the plaintiff's hands and arms." (*Id.* at 7-8.) In a later section

---

[3]     Moreover, the ALJ was not obliged to give any weight to Dr. Casey's statement that the Plaintiff was "unable to work," because "[t]he final question of disability . . . is expressly reserved to the Commissioner." *Snell v. Apfel*, 177 F.3d 128, 133-34 (2d Cir. 1999); *see also* 20 C.F.R. § 404.1527(d).

of her brief she expresses the argument in functional terms; there, she says that the "numbness in the arms and hands" and other symptoms of radiculopathy were "not consistent with the ability to perform the jobs identified by the VE, all of which required frequent handling and fingering." (*Id.* at 15.) Accepting her invitation to treat these as distinct arguments, the Court will address the first argument here and the second in Section III.E below.

The MRI in question was performed at Lawrence & Memorial Hospital on May 1, 2017. (R. 894-95.)  The radiologist imaged the Plaintiff's cervical spine from the craniovertebral junction to the C6-C7 intervertebral space, and he summarized what he saw in a section entitled "Findings." (*Id.*)  At the C2-C3 level, he found "a mild diffuse disc osteophyte complex[]" but "no significant canal stenosis or neural foramen encroachment."  (R. 894.)  At C3-C4, he observed "a diffuse disc osteophyte complex[]" and "mild left neural foramen encroachment."  (R. 894-95.)  At C4-C5 he saw "a diffuse disc osteophyte complex[]" but, as at C2-C3, "no significant canal stenosis or neural foramen encroachment."  (R. 895.)  At the C5-C6 level he observed "a diffuse disc extrusion . . . with facet hypertrophy . . . [and] mild to moderate bilateral neural foramen encroachment."  (*Id.*)  And at C6-C7, he found "a diffuse disc osteophyte complex[] . . . with possible moderate left neural foramen encroachment."  (*Id.*)

Yet in the section of his report entitled "Impressions," the radiologist stated that his study was "significantly limited secondary to excessive motion artifact."[4]  (*Id.*)  He noted "multilevel spondylosis, most significant at the C5-C6" level, but added that "[t]he degree of neural foramen

---

[4]     "In imaging, an artifact refers to a false signal intensity or void that does not correspond to the physical structure under examination.  MRI artifacts are of three general types: magnetic and RF field distortion artifacts, artifacts due to data reconstruction errors and motion artifacts. . . .  Patient motion, due to periodic respiratory movement or to body movement during imaging, can cause blurring, ghosting and the appearance of signal bands on the image." Courtroom Medicine Series § 29B.25 (2015) (Lexis).

encroachment is difficult to assess at multiple levels given extensive motion artifact." (*Id.*)  He recorded "mild elevated signal . . . in the endplates at the C5-C6 level with retrolisthesis at this level," and observed that "[t]his may suggest active arthropathy." (*Id.*)

The Plaintiff visited her osteopathic physician, Dr. Casey, eighteen days later.  In her treatment notes, Dr. Casey recorded an "[a]ssessment" of "[c]ervical radiculopathy at [the] C5 nerve root." (R. 907.)  She went on, however, to note the MRI's "limitation." (*Id.*)  At the end of her note, she characterized the MRI as showing only a "*possibility* of radiculopathy." (*Id.*) (emphasis added).   She referred the Plaintiff to physical therapy "for evaluation and treatment" with "any gentle modality." (*Id.*)

The ALJ discussed the MRI in the course of formulating the Plaintiff's RFC.  He wrote that "[m]agnetic resonance imaging of the cervical spine from May 2017 showed mild diffuse disc osteophyte complexes at C2-C3 with no significant canal stenosis." (R. 218.)  Noting Dr. Casey's assessment of "cervical radiculopathy at the C5 nerve root," the ALJ wrote that this was "not confirmed by diagnostic testing." (R. 220.)  And citing the MRI report, he referred to Dr. Casey's assessment as a "clinical finding that is unsupported by the diagnostic testing which showed no clear cord or nerve root encroachment/compression." (*Id.*)

In her brief, the Plaintiff says that the ALJ read the medical records wrong. (ECF No. 16-2, at 7-9.)  She says that "[t]he MRI of May 2017 objectively showed neural foramen encroachment at C5-C6 and possible moderate encroachment [at] C6-C7, which is consistent with and supports the medical assessment of nerve compression, with cervical radiculopathy causing numbness in the plaintiffs [sic] hands and arms." (*Id.* at 8.)  In short, she says that he "[in]correctly assess[ed] the severity of the cervical disc disease." (*Id.* at 7.)

As noted, the Court will address the functional and vocational dimensions of this argument in Section III.E below.  But as a strictly medical matter, the Court is unable to conclude that the ALJ erred, let alone that any such error would be harmful.  The Plaintiff's recapitulation of the MRI fails to note that the "study [was] significantly limited secondary to excessive motion artifact."  (R. 895.)  And her certainty that "the MRI objectively showed neural foramen encroachment" is undermined by the report itself – which stated that "[t]he degree of neural foramen encroachment is difficult to assess . . . given extensive motion artifact" (*id.*) – and also by Dr. Casey's conclusion that the study suffered from a "limitation" and raised only a "possibility" of radiculopathy.  (R. 907.)  Against this backdrop, the ALJ's statement that "cervical radiculopathy . . . [was] not confirmed by diagnostic testing" is not clearly wrong.

Moreover, even if the ALJ had made a factual error in his review of the evidence, the Plaintiff would have to show that it was a harmful error.  The case of *Howarth v. Berryhill*, No. 3:16-cv-01844 (JCH), 2017 WL 6527432, at *16 (D. Conn. Dec. 21, 2017) explains this point in a factual setting similar to the one present here.  In *Howarth*, an ALJ misread a medical record of "very brittle bipolar disorder" as "very little bipolar disorder."  *Id.*  Judge Hall noted that "[w]hen an ALJ misreads the record, in some cases remand may be appropriate."  *Id.* (citing *Rivera v. Astrue*, No. 10-cv-4324 (RJD), 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012).  "However, courts in other instances have held the error to be harmless if the ultimate determination is nonetheless supported by substantial evidence."  *Id.* (citing *Trombley v. Colvin*, No. 8:15-cv-00567 (TWD), 2016 WL 5394723, at *4 n.6 (N.D.N.Y. Sept. 27, 2016) and *Coates v. Colvin*, No. 5:12-cv-1340 (GLS), 2013 WL 3148222, at *4 (N.D.N.Y. June 19, 2013)).  Although "very little bipolar disorder" and "very brittle bipolar disorder" would have led to "different interpretations of [the claimant's] condition," "the error was harmless because the ALJ's RFC analysis was supported by

substantial evidence that included [the claimant's] own statements, the treatment notes of his healthcare providers, [and] the other medical opinions in the record." *Id.* In this case, the RFC is similarly supported by substantial evidence, for the reasons to be discussed in Section III.E. Thus, even if the ALJ had erred in his reading of the MRI report, the error would have been harmless.

### D.     The Plaintiff's Challenges to the ALJ's Assessment of Her Testimony and Credibility

The Plaintiff next argues that the ALJ "erred in his assessment of [her] testimony as to activities of daily living and in his credibility assessment." (ECF No. 16-2, at 9-14.) She asserts that he "cherry picked the medical records to justify his conclusion" (*id.* at 9-10); misread other records in the course of concluding that she had not complied with treatment (*id.* at 10-12); mischaracterized her testimony about her activities of daily living (*id.* at 12-14); and generally erred in his "assessment of her credibility." (*Id.* at 14.) She sums up by arguing that "the ALJ's assessment of credibility and ability to perform" activities of daily living "is incomplete, inaccurate, and flawed, requiring remand." (*Id.*)

The Plaintiff's argument implicates the SSA's two-step process for evaluating a claimant's symptoms. *See* 20 C.F.R. § 404.1529(c)(1); *see also* Soc. Sec. Ruling ("SSR") 16-3P, 2017 WL 5180304, at *3 (S.S.A. Oct. 25, 2017) ("We use a two-step process for evaluating an individual's symptoms."). In the first step of the process, the ALJ must determine whether the "medical signs or laboratory findings" show that the claimant "has a medically determinable impairment . . . that could reasonably be expected to produce" her symptoms. *Id.* If so, the ALJ then proceeds to the second step, at which he evaluates "the intensity and persistence of [the claimant's] symptoms such as pain," and determines the extent to which those symptoms "limit his or her ability to

perform work-related activities."[5]  *Id.* at *4; *see also Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).   In this case, the ALJ found "that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms."  (R. 216.)  He added, however, that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record."  (*Id.*)  Since the ALJ agreed with her at the first step, the Plaintiff's argument is necessarily a challenge to the way he handled the second step.

At that step, "the ALJ must consider all of the available evidence, including objective medical evidence, from both medical and nonmedical sources."  *Gonzalez v. Berryhill*, No. 3:18-cv-00241 (SRU), 2020 WL 1452610, at *12 (D. Conn. Mar. 25, 2020).  The ALJ "may not reject a claimant's subjective opinion regarding the intensity and persistence" of her symptoms "'solely because the available objective medical evidence does not substantiate . . . her statements."  *Id.* (quoting 20 C.F.R. § 416.929(c)(2)) (alteration omitted); *see also* 20 C.F.R. § 404.1529(c)(2).  If there is a conflict between the objective evidence and the claimant's testimony, "the ALJ 'must consider the other evidence,'" including "(1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the claimant's pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain; (5) treatment, other than medication, received for pain relief; (6) measures taken to relieve pain and other symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms."  *Id.* (quoting *Graf v. Berryhill*, No. 3:18-cv-00093

---

[5]      The Plaintiff describes this step as a "credibility assessment" (ECF No. 16-2, at 9), but the SSA no longer uses that term.  *See* SSR 16-3P, 2017 WL 5180304 at *2 ("[W]e are eliminating the use of the term 'credibility' from our sub-regulatory policy, as our regulations do not use this term.  In doing so, we clarify that subjective symptom evaluation is not an examination of an individual's character.").

(SRU), 2019 WL 1237105, at *8 (D. Conn. Mar. 18, 2019)) (internal quotation marks and alterations omitted).

Provided that the ALJ follows this process, his conclusions are entitled to deference from this Court. "It is the role of the Commissioner, not the reviewing court, 'to resolve evidentiary conflicts and to appraise the credibility of witnesses,' including with respect to the severity of a claimant's symptoms." *Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013) (summary order) (quoting *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)). These findings "are entitled to great deference and therefore can be reversed only if they are 'patently unreasonable.'" *Pietrunti v. Dir., Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) (quoting *Lennon v. Waterfront Transp.*, 20 F.3d 658, 661 (5th Cir. 1994)); *see also Gonzalez*, 2020 WL 1452610, at *13 (same).

In this case, the ALJ followed the process set out in the Social Security regulations and rulings. He began by considering the objective evidence, including "generally mild findings," "intact mental status examinations," "intact" "physical examination[s]," and reports of "normal range of motion" with "no motor deficits." (R. 217-20.) He then considered the Plaintiff's daily activities, and noted among other things that in July 2016 – more than four years after her claimed disability onset date – "treatment notes show that the claimant had no difficulties with her activities of daily living and that she exercised seven times per week for 60 minutes each time." (R. 220.) He made a number of notations about the "location, duration, frequency and intensity" of the Plaintiff's symptoms. (*E.g.,* R. 217 (noting that Plaintiff "felt down, depressed or hopeless" at one mental health visit; was "interpersonally appropriate and cooperative" at another); R. 218 (noting that, after claimed disability onset date, Plaintiff "had increased pain due to working double[]" shifts; had "hip pain when at work . . . that . . decreased when she was not working;"); R. 219

(noting "complain[ts] of increasing pain in her low back and hips;" but that her "pain had improved" by February 2017); R. 220 (noting "that the claimant had generalized achiness" and reported "decreased strength throughout her upper extremities but her gait was straight and steady").)  And he considered how her symptoms responded to medication and other treatment. (*E.g.*, R. 218 (noting "improvement with treatment" and "fail[ure] to comply with prescribed medications"); R. 219 (noting additional record evidence of "claimant . . . not taking her medications as prescribed," and further noting the "routine and conservative . . . nature" of her treatment).)

Because the ALJ followed the process set out in the regulations, to prevail in her argument the Plaintiff must show that the ALJ's substantive decision was "patently unreasonable."  *See Pietrunti*, 119 F.3d at 1042; *Gonzalez*, 2020 WL 1452610, at *13.  Without using those precise words, the Plaintiff contends that the ALJ's decision meets this demanding test because he engaged in impermissible "cherry picking" and misread the medical and other evidence.  (ECF No. 16-2, at 9-14.)  The Court disagrees.

 "The term 'cherry picking' generally refers to 'improperly crediting evidence that supports findings while ignoring conflicting evidence from the same source.'"  *Rodriguez v. Colvin*, No. 3:13-cv-01195 (DFM), 2016 WL 3023972, at *2 (D. Conn. May 25, 2016).  The concept generally does not apply when the record demonstrates "that the ALJ took into account, and gave weight to, evidence . . . that [the claimant] could not perform many physical tasks as a result of" her symptoms.  *Sena v. Berryhill*, No. 3:17-cv-00912 (MPS), 2018 WL 3854771, at *11 (D. Conn. Aug. 14, 2018).  It also has been held not to apply when "the sheer number of times the ALJ cited" the relevant pieces of medical evidence "demonstrates that the ALJ certainly took them into account, even if he did not quote the aspects of the notes that were more favorable to" the

claimant's claim.  *Id.*  In this case, the Plaintiff asserts that the ALJ cherry picked the record because he cited unfavorable entries in her primary care physician's treatment notes, without citing the favorable entries.  (ECF No. 16-2, at 9-10.)  But the ALJ discussed those notes extensively in his decision, and he referenced both "good" and "bad" entries.  (*E.g.*, R. 217 (citing primary care physician's notes "show[ing] that the claimant felt down, depressed, or hopeless," and had "dysthymic mood"); R. 218 (noting "abdominal tenderness" in physician's records); R. 219 (noting "some wheezing" as a consequence of asthma; an assessment of "moderate persistent asthma" in July 2016; and "complain[ts] of increasing pain in her low back and lateral hips" in November 2016).)

The Plaintiff also asserts that the ALJ cherry picked the record with respect to her compliance with treatment, but here too, his discussion was sufficiently balanced.  To be sure, he noted that "the claimant was not taking her medications as prescribed" in February and November 2015.  (R. 218-19.)  And he noted that "[i]n May 2016, the claimant admitted to continuing to avoid the use of medications."  (R. 219.)  But he also observed that the Plaintiff had "started her psychotropic medications" (R. 217), and that she underwent the course of physical therapy that her primary care physician had prescribed for her.  (R. 219.)  While his references to non-compliance with treatment outnumbered his references to compliance, there were enough of the latter to make a charge of cherry picking inapposite here.

Finally, the Plaintiff argues that the ALJ misread the evidence about her activities of daily living (ECF No. 16-2, at 12), but he committed no reversible error here either.  The Plaintiff says that the ALJ inaccurately recounted her "custody and child support issues," erroneously stating that she had lost custody of five of her six children when in fact it was only two (*id.*), but this was a harmless error.  The ALJ's point was that her level of childcare activity was inconsistent with

her claim to be unable to perform any substantial gainful activity (R. 220), and that point would not be undermined if she had additional children in her custody.  The Plaintiff also faults the ALJ for pointing out that she "[drove] her boys to places four times a week" without also noting that she was required to do so for medical reasons.  (ECF No. 16-2, at 13.)  But as long as an ALJ is being reasonably even-handed and has substantial evidentiary support for his conclusions, he is not required to reference and discuss every favorable entry in the record.  *Cf. Matta v. Astrue*, 508 F. App'x 53, 56-57 (2d Cir. 2013) (summary order) (noting that ALJs need not reference every one of the claimant's "worse days" as well as his "better days" to avoid a charge of cherry picking, so long as "his decision is supported by substantial evidence").

  **E.**  **The Plaintiff's Challenges to the ALJ's RFC**

   In Section V of her brief, the Plaintiff argues that the ALJ "erred in his RFC analysis" by "failing to fully consider the effect of all of [her] medical conditions."  (ECF No. 16-2, at 14.)  She contends that "[t]he effect of [her] multiple medical conditions, in combination, is not consistent with an RFC at the light exertional level."  (*Id.* at 15.)  Specifically, she says that the ALJ failed adequately to account for her "symptoms related to colitis" and her "cervical condition as demonstrated by the MRI findings" (*id.*), and that he incorrectly applied the medical opinion evidence in the record.  (*Id.* at 16.)  Summing up in Section VI, she argues that "[b]ecause the ALJ failed to properly determine the RFC at Step 3, his conclusions at Step 5 are not supported by substantial evidence."  (*Id.* at 17.)  Here, too, the Court disagrees.

   In particular, the Court disagrees that the ALJ erred with respect to the Plaintiff's colitis. The Plaintiff says that this illness is "unpredictable in nature and would cause her to miss more than one day a month from work on a consistent basis and to be off task more than 10% of the workday," but she does not cite any record evidence in support of this claim.  (*Id.* at 15.)  She

testified at the hearing that she experienced diarrhea "daily" (R. 294), but the record evidence is to the contrary. A 2017 treatment note from her gastroenterologist reflects that, at that time, her "[d]isease course ha[d] been stable without medication use" and her "[b]aseline [irritable bowel disease] symptoms have remained in remission since [her] last visit." (R. 1242.) Each of the gastroenterological treatment notes records her as "den[ying] change in bowel habits," and "den[ying] diarrhea." (R. 1244-1307.) In fact, the records reflect her complaining not about diarrhea, but rather about constipation. (*E.g.*, R. 1242.) And as the ALJ noted, when the Plaintiff was admitted to the hospital for other reasons shortly after her date last insured, she gave a medical history stating that she had had "no recent flares" of her colitis symptoms. (R. 220, 1030, 1034.) In short, there was substantial evidence for an RFC that did not make any special allowances for colitis flare-ups or for "daily" diarrhea.[6]

There was also substantial evidence for the RFC notwithstanding the Plaintiff's cervical spine condition and MRI findings. The Plaintiff says that her "cervical condition as demonstrated by the MRI findings, and which showed no improvement with conservative treatment, ultimately requiring fusion surgery, clearly limited [her] ability to perform work at the light exertional level." (ECF No. 16-2.) But she cites only a single progress note in support of that claim (*id.*) (citing R. 1055-57), and that note does not clearly document any functional deficits inconsistent with a light-work RFC. The note records "decreased strength" in the Plaintiff's biceps and triceps, but does not say by how much; it records "decreased . . . finger extension" without saying whether that decrease would interfere with any work that requires fingering; and it records "numbness in the

---

[6]     The Plaintiff notes that a consultative examiner once wrote that her "stamina and pace would be unpredictable in light of her colitis flare-ups and fatigue." (ECF No. 16-2, at 16) (citing R.851). But that examiner was Jennifer Selden, Ph.D., a clinical neuropsychologist. (R. 851.) There is nothing in the record supporting Dr. Selden's qualifications to opine about colitis.

arms and hands," but only "occasionally." (R. 1055-57.) It also states that in all other respects, the Plaintiff's "upper extremity strength is 5 over 5." (*Id.*) Moreover, the note was written after her date last insured. (*Id.*)

On the other side of the scale, the administrative record contained substantial evidence that the Plaintiff was not so limited. For example, the record included considerable evidence that the Plaintiff could walk without difficulty. (*E.g.*, R. 805 (Dec. 9, 2016 orthopedic note documenting that Plaintiff was "able to ambulate without [assisting devices] for community distances without major deficits"); 838 (Jan. 13, 2017 note from Nurse Practitioner Allan Dierman documenting "normal" gait); 825 (Apr. 11, 2017 note from Dr. Casey reflecting "normal" gait); 941 (Sept. 7, 2017 treatment note from Dr. Casey documenting "normal" "gait and stance").) It also included dozens of entries recording that the Plaintiff could independently perform her activities of daily living. (*E.g.*, R. 585, 589, 597, 603, 824 (progress notes from Dr. Casey, recording "[n]o difficulties with activities of daily living"); R. 829 (similar note from Nurse Practitioner Dierman); R. 857 (Dr. Selden's report, recording that "[Plaintiff] is independent in activities of daily living").) With respect to lifting, the record included a notation that the Plaintiff could still lift her twins in 2013, more than a year after her claimed disability onset date (R. 656), and it also included the Plaintiff's own statement that she could lift twenty pounds. (R. 509.) And it included a number of progress notes documenting full and complete range of motion in her neck. (*E.g.*, R. 792 (July 14, 2016 note from Claudette Faucher-Charles, APRN, documenting "full range of motion" in neck); 797-98 (note from APRN Faucher-Charles, noting that Plaintiff's neck was "non-tender, supple," and had "full range of motion" on Nov. 23, 2016); R. 862 (note from APRN Faucher-Charles, documenting "full range of motion" in neck on Jan. 17, 2017); 915 (Aug. 15, 2017

emergency department note documenting a "normal inspection" of the neck and extremities, and "normal range of motion" in the extremities).)

The substantiality of this evidence also disposes of the Plaintiff's argument about the ALJ's treatment of the medical opinion evidence.  The Plaintiff contends that the ALJ "erred in failing to base his decisions on the opinions of either the treating or non-examining doctors in finding that the plaintiff could perform a reduced range of light exertional work." (ECF No. 16-2, at 16.)   She does not make the familiar argument that the ALJ committed legal error in assigning weight to the various pieces of opinion evidence, *see, e.g., Greek v. Colvin*, 802 F.3d 370 (2d Cir. 2015) (discussing treating physician rule); rather, she essentially faults him for discounting opinion evidence as an entire class and deciding the case instead on treatment notes and the like.  (ECF No. 16-2, at 16.)  But an ALJ can properly rely on the latter sort of evidence in formulating an RFC, so long as the record is sufficiently extensive to permit him to make an informed assessment. *See Tankisi*, 521 F. App'x at 34 (holding that, where the administrative record is sufficiently "extensive" and "voluminous" to "permit an informed finding by the ALJ," "it would be inappropriate to remand solely on the ground that the ALJ failed to request medical opinions in assessing residual functional capacity"); *see also Pellam v. Astrue*, 508 F. App'x 87, 90-91 (2d Cir. 2013) (summary order) (upholding ALJ's decision, even though he "rejected" the only medical opinion evidence in the record, because he "had all of the treatment notes" and his "[RFC] determination was supported by substantial evidence").  That was the case here.

The ALJ's handling of the medical opinion evidence provides no basis for reversing his decision.  The Plaintiff notes that the ALJ "gave . . . less weight" to the opinions of two state agency consultative examiners (ECF No. 16-2, at 16), but he did so because he thought they did not place *enough* restrictions on her ability to work, not because they placed too many.  (R. 221

(placing "[l]ess weight" on consultative examiner reports in part because they did not include enough "postural limitations").)  And it is well established that "[w]here an ALJ makes an RFC assessment that is *more* restrictive than the medical opinions of record, it is generally not a basis for remand."  *Baker o/b/o Baker v. Berryhill*, No. 1:15-cv-00943 (MAT), 2018 WL 1173782, at *2 (W.D.N.Y. Mar. 6, 2018) (*citing Castle v. Colvin*, No. 1:15-cv-00113 (MAT), 2017 WL 3939362, at *3 (W.D.N.Y. Sept. 8, 2017) (emphasis in original); *see also  Savage v. Comm'r of Soc. Sec.*, No. 2:13-cv-85, 2014 WL 690250, at *7 (D. Vt. Feb. 24, 2014) (finding no harm to claimant where ALJ adopted an RFC determination that was more restrictive than medical source's opinion)).  The Plaintiff also faults the ALJ for disregarding 2018 reports from Dr. Casey (ECF No. 16-2, at 16), but these were authored after the date last insured (R. 1189-95, 1196-1201, 1774), and would not have been material to the question of disability as of that date in any event.[7]  Dr. Casey's January 19, 2017 report pre-dated the date last insured, but that report did not support a finding of disability either; it was written when the Plaintiff was about to undergo hernia repair surgery, and at that time, Dr. Casey expected her to be able to return to work "between [thirty] days and [three] months."  (R. 1544-46.)

Finally, the Plaintiff argues in Section VII of her brief that because the ALJ erred in formulating the RFC, his Step Five conclusions were erroneous by implication.  (ECF No. 16-2, at 17-18.)  Because the Court has found no reversible error in the RFC, it finds no error at Step Five.  The hypothetical questions that the ALJ posed to the VE directly tracked with the RFC.

---

[7]     As noted above, at the time of her March 29, 2018 report, Dr. Casey expected that the Plaintiff's then-existing symptoms would prevent her from working for "less than [twelve] months."  (R. 1190.)  And her October 31, 2018 letter opined on the ultimate question of disability and, therefore, would have been properly disregarded by the ALJ even if it had predated the date last insured.  (*See* discussion, *supra* n.3.)  Also, Dr. Casey's March 29, 2018 mental impairment report documented "[e]xcellent ability" in every dimension evaluated.  (R. 1199-1200.)

(*Compare* R. 215 *with* R. 305-07.)  The VE's answers therefore accurately reflected the RFC and provided substantial evidence for a determination that the Plaintiff was not disabled.  *See Salmini v. Comm'r of Soc. Sec.*, 371 F. App'x 109, 114 (2d Cir. 2010) (summary order) ("Because we find no error in the ALJ's RFC assessment, we likewise conclude that the ALJ did not err in posing a hypothetical question to the [VE] that was based on that assessment.").

The ALJ found the Plaintiff was not disabled because, despite her severe impairments, she still retained the residual functional capacity to perform light work with additional limitations.  (R. 221.)  He sufficiently set forth his reasons and the evidence upon which he relied.  (R. 215-21.)  "It is not the function of this Court to re-weigh evidence or consider *de novo* whether [a claimant] is disabled."  *Teena H. o/b/o N.I.K. v. Comm'r of Soc. Sec.*, No. 1:19-cv-01523 (EAW), 2021 WL 707744, at *3 (W.D.N.Y. Feb. 24, 2021).  Rather, "[a]bsent a legal error, the Court must uphold the Commissioner's decision if it is supported by substantial evidence, even if the Court might have ruled differently had it considered the matter in the first instance."  *Russell v. Saul*, 448 F. Supp. 3d 170, 175 (D. Conn. 2020).  In this case, the ALJ's decision was both free from legal error and supported by substantial evidence, and the Court therefore affirms it.

## IV.    CONCLUSION

For the reasons stated above, the Plaintiff's Motion for Order reversing or remanding the Commissioner's decision (ECF No. 16) is **DENIED**.  The Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 19) is **GRANTED**.

This is not a recommended ruling.  The consent of the parties allows this magistrate judge to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure.  (ECF No. 10.)  Appeals may be made directly to the appropriate United States Court of Appeals.  *See* 28 U.S.C. § 636(c)(3); Fed. R. Civ. P. 73(c).  The Clerk of the Court is respectfully directed to enter judgment in favor of the Defendant, and to close this case.

So ordered this 30th day of September 2021, at Hartford, Connecticut.

*/s/ Thomas O. Farrish*
_____
Hon. Thomas O. Farrish
United States Magistrate Judge